# In the United States Court of Federal Claims

**REDACTED VERSION**

No. 09-372C
Filed: November 10, 2009
Reissued: December 3, 2009[*]

| | | |
|---|---|---|
| STRUCTURAL ASSOCIATES, INC./COMFORT SYSTEMS USA (Syracuse) Joint Venture,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | <u>Post-Award Bid Protest</u>: Where an agency distinguished between offerors for a contract award based on whether an offeror had experience constructing the same type of building as identified in the solicitation, the agency: (1) was not required to raise the protestor's past experience in discussions since the agency did not consider that experience a weakness; (2) did not disregard the weighting scheme set forth in the solicitation since the solicitation explicitly provided that offerors who met all of the criteria may be more highly rated; and (3) properly conducted its best value analysis since the determination that an offeror's possession of the same experience as sought in the solicitation warranted a higher price was within the discretion of the agency. |

   <u>Walter G. Breakell</u>, Breakell Law Firm, P.C., Albany, New York and <u>David S. Cohen</u>, Cohen Mohr, LLP, Washington, DC, counsel for plaintiff.  <u>John J. O'Brien</u>, Cohen Mohr, LLP, Washington, DC, of counsel.

   <u>Joseph A. Pixley</u>, with whom were <u>Assistant Attorney General Tony West</u>, <u>Director Jeanne E. Davidson</u>, and <u>Assistant Director Kenneth M. Dintzer</u>, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant.  <u>Howard E. Strackbein</u>, U.S. Army Corps of Engineers, Fort Worth, TX, of counsel.

---

   [*] The court originally issued this order under seal on November 10, 2009, pursuant to the protective order entered in this case on July 17, 2009.  After a review of the redactions proposed by the parties, the court is issuing a redacted version of the order in conformance with the E-Government Act of 2002.

**OPINION**

WIESE, Judge.

Plaintiff, SAI/Comfort, a joint venture between Structural Associates, Inc. and Comfort Systems USA (Syracuse), is a disappointed bidder in a procurement for the design and construction of military barracks for the United States Army Corps of Engineers ("the Corps" or "the agency"). Following the selection of three contractors in the initial phase of a Multiple Award Task Order Contract ("MATOC"), plaintiff now seeks to enjoin the performance of those task orders on the ground that the agency failed to conduct meaningful discussions, erroneously downgraded an element of plaintiff's proposal, and performed an improper best value analysis.

The case is now before the court on the parties' cross-motions for judgment on the administrative record. The parties have fully briefed the issues and the court heard oral argument on October 27, 2009. For the reasons announced at the conclusion of the oral argument and for those set forth below, we grant defendant's cross-motion and direct the dismissal of plaintiff's complaint.

BACKGROUND

On February 5, 2009, the Corps issued a solicitation seeking proposals for the design and construction of unaccompanied enlisted personnel housing ("UEPH") at Fort Drum, in Watertown, NY. The solicitation anticipated the award of up to three indefinite delivery/indefinite quantity ("IDIQ") contracts to the responsible offerors whose proposals were determined to "conform[] to the solicitation," to be "fair and reasonable with regard to pricing for the initial task order," and to offer "the best overall value to the Government, considering the price and non-price factors" set forth in the solicitation. More particularly, Section 2 of the solicitation described the award process as follows:

> After the Government individually evaluates and rates each proposal, the Contracting Officer/Source Selection Authority will compare proposals to determine which proposals represent the best value for award. Award of the first IDIQ and initial task order will be made to the Offeror whose proposal is determined to represent the best overall value to the Government based on the evaluated ratings from the proposal. . . .
>
> The Contracting Officer will award the subsequent contracts to the Offerors whose proposals are considered to represent the remaining best value to the Government based on the evaluated rating.

2

Proposals were to be evaluated on the basis of three factors: Performance Capability, Design Technical, and Price and Small Business Utilization, with Design Technical identified as the most important factor, followed by Performance Capability, then Price and Small Business Utilization. The solicitation further advised that "[a]ll evaluation factors, other than price, when combined, are considered significantly more important than the price."

The solicitation directed offerors to submit a separate volume for each of the three evaluation factors. Volume I, addressing an offeror's Performance Capability, was divided into subfactors including, inter alia, Organization and Technical Approach, Proposed Task Order Duration and Summary Schedule, Specialized Experience, Utilization of Small Business Concerns, and Past Performance. The solicitation provided that the first four subfactors would not be separately rated, but that the fifth subfactor, Past Performance, was to be rated for risk.

Under the subfactor Specialized Experience, offerors were directed to "demonstrate recent, relevant experience on similar projects" by describing projects that were "currently well underway" (defined as projects that were "designed and at least 50% construction progress completed") or were "completed and turned over no longer than five (5) years preceding the date of this Solicitation." The solicitation explained that an offeror's projects would be deemed similar to the instant procurement "if they are similar in complexity, in type, scope, or magnitude." These criteria were in turn defined as consisting of the new construction of "apartment complexes, college dorms or their equivalent or similar commercial institution," ranging from 24,000 to 175,000 square feet, with a construction value between $20 and $75 million and anti-terrorism and force protection features.

The solicitation specified that the submitted projects "do not have to include all of the criteria," but advised that "projects that meet all of the criteria may be more highly rated." The solicitation additionally provided that the agency would "place greater value on projects performed as a prime contractor than as a subcontractor, depending upon overall role and relevancy considerations."

Under the terms of the solicitation, evaluation of the proposals was to be carried out by a Source Selection Evaluation Board ("SSEB") whose members were required to assign a consensus rating of "Excellent," "Good," "Acceptable," "Marginal," or "Unacceptable" for the Performance Capability and Design Technical aspects of each offeror's proposal. The SSEB was additionally charged with assessing the risks "associated with each Offeror's likelihood of success in performing the requirements stated in the [solicitation]" based on the offeror's demonstrated performance on recent contracts. Offerors were accordingly to be given a Past Performance rating of "Neutral/Unknown Risk," "Low Risk," "Moderate Risk," or "High Risk." The solicitation informed offerors that the Corps intended to make the award without conducting discussions, but reserved the right to do so if the agency deemed it necessary.

Following review of the proposals by the SSEB, the Source Selection Authority ("SSA") was in turn charged with determining which proposals represented the best value to the government and, based on that assessment, selecting contractors for award. The SSA was not, however, bound by the findings of the SSEB in making the final source selection decision.

Plaintiff submitted a proposal on March 13, 2009, expressing its intention to partner with various subcontractors in its performance of the contract. Pursuant to this strategy, plaintiff advised that SAI would be in charge of the overall project management, including scheduling, site management, and quality control, and that Comfort Systems would be responsible for trade-specific quality control and for mechanical, HVAC (heating, ventilation, air conditioning), plumbing, and fire protection construction. In addition, the proposal indicated that plaintiff intended to subcontract with QPK Design to provide architectural and structural design; M/E Engineering to provide plumbing, electrical, fire protection and HVAC design; AMEC Earth & Environmental to provide civil, environmental, and geo-technical engineering; and DEMCO New York Corp. to perform the project's electrical work.

Consistent with the solicitation's instructions, plaintiff described its collective experience in part as follows:

> The Design/Build team of Structural Associates, QPK Design, and M/E Engineering has recently completed the $33 million Design/Build Aviation Facilities I at Ft. Drum, NY. This same team, along with AMEC Earth & Environmental as the site/civil designer and Comfort Systems USA as the mechanical/plumbing/fire protection subcontractor has also recently completed constructing the $29 million Design/Build BCT [Basic Combat Training] First Complex, Phase I and the $38 million Design/Build BCT Third Complex, Phase I, and is presently constructing the $43 million Design/Build BCT First Complex, Phase II and the $41 million Design/Build BCT Third Complex, Phase II projects at Fort Drum.
>
> SAI has previously performed contract work as either a Prime Contractor or Prime Sub-Contractor on over $200 million worth of contract work at Ft. Drum, NY, including construction of the original Aviation Facilities, Commissary and PX, Barracks Rehab, Unit Chapels, Rapid Deployment Facility, Central Wash Facility, the Design/Build Aviation Vehicle Maintenance Facility, and most recently the [Tactical Unmanned Aerial Vehicle] Facility and the [Air National Guard] Readiness Center.
>
> SAI has also completed projects for the Corps of Engineers throughout the United States, including projects at Offutt AFB [Air Force Base], Nebraska; Minot AFB, North Dakota; McConnell AFB,

4

>Kansas; and at the Pentagon.  For each of these projects SAI has been evaluated as being "Above Average" or "Outstanding" in their performance on the contract.

Plaintiff additionally attached several letters of reference and performance evaluations in connection with the referenced projects.

The SSEB convened to evaluate proposals on March 16, 2009.  Based on its initial evaluation, the SSEB determined that discussions were necessary and accordingly sent letters initiating such discussions to the five offerors, including plaintiff, that were judged to be in the competitive range.  In the letters, the contracting officer requested the offerors to respond to uncertainties, weaknesses, and deficiencies identified by the SSEB in the proposals and to submit final proposal revisions by April 17, 2009.

In her letter to plaintiff, the contracting officer identified the following "uncertainties" regarding plaintiff's specialized experience:

>1) In the submitted Specialized Experience, all five projects shown by [Comfort Systems, doing business as Woodcock and Armani] show the dollar amounts below the RFP [Request for Proposals] cost threshold. The board is assuming that the dollar amount shown is for their portion of the work and not the total cost of the project. Submit an updated list showing the total cost of the projects that were submitted by the A-E [architect-engineer].
>
>2) SAI shows a project that is purely civil project that does not meet scope and square footage requirements of the RFP (Hydrant Fuel System at Cherry Point, NC). The board has an uncertainty to how this civil project has relevance for a barracks contract that is to be awarded.

Plaintiff addressed the Corps' concerns in a letter dated April 15, 2009.  In response to the first uncertainty, plaintiff advised as follows:

>The dollar amount shown is for Woodcock and Armani's portion of the work and not the total cost of the project. The total cost[] for each project is as follows:
>
>a. BCT 1st Complex Phase I–W912DS-07-C-0010 $29.2 million
>b. BCT 3rd Complex Phase I–W912DS-07-C-0011 $38.6 million
>c. Colgate University Student Housing $15 million
>d. Diverty Troop Barracks $48.8 million
>e. Wheeler Sack Army Airfield Barracks Expansion Project $83 million.

5

In response to the second uncertainty, plaintiff further advised as follows:

> The Hydrant Fuel System at Cherry Point, NC project was submitted to show additional successful experience for SAI working on a negotiated RFP contract for the [Department of Defense]; a project exceeding $20 million; and a project demonstrating our ability to manage and construct a complex project in other than the Fort Drum geographic area. SAI received an outstanding evaluation for this project.

Following the submission of final proposals, the SSEB reevaluated the five offerors within the competitive range and issued its Source Selection Evaluation Report on April 17, 2009. These ratings, together with each offeror's proposed price, are summarized below:

| Factor | SAI/Comfort Systems | Korte Construction Company | Suffolk Construction Company | Whiting-Turner Contracting | Purcell-Lawman |
|---|---|---|---|---|---|
| Performance Capability | Excellent[1] | Excellent | Excellent | Excellent | Excellent |
| Past Performance Risk | Low | Low | Low | Low | Low |
| Design Technical | Excellent | Excellent | Excellent | Excellent | Excellent |
| Total Price | **[REDACTED]** | **[REDACTED]** | **[REDACTED]** | **[REDACTED]** | **[REDACTED]** |

The SSA reviewed the SSEB's evaluations and issued her Source Selection Decision Document on April 30, 2009. Significant for the purposes of this protest, the SSA downgraded plaintiff's Performance Capability rating from "excellent" to "good." In her Source Selection Decision, the SSA explained the basis for this change as follows:

> SAI/Comfort Systems JV [Joint Venture] noted experience on new design build construction projects meeting the size in square footage,

---

[1] In the narrative section of its evaluation report, the SSEB identified plaintiff's Performance Capability rating as "good," but identified the rating as "excellent" elsewhere in the report. Defendant labels this discrepancy a "clerical error" and advises the court that the "excellent" rating is the one the SSEB intended.

6

dollar magnitude, and force protection requirements as this requirement; however, no prior experience on new construction of barracks, college dorms, or apartment complexes was provided. The proposed design firm listed two projects that were similar in scope to this requirement. The first project was a townhouse style campus apartment housing complex and the second project was a 5-story, 61,004 SF, 150 bed college dormitory. The SSEB's assignment of an Excellent rating is not in accordance with the solicitation. SAI/Comfort Systems does not have barracks or apartment complex experience, where clearly in the solicitation . . . firms are rated higher if they meet all criteria. SAI/Comfort Systems meets the size (SF) and magnitude (dollar value) stated in the solicitation but does not meet type. Accordingly, the final rating for this firm is reduced from Excellent to Good for this factor.

In a summary of the offerors' relative strengths, the SSA continued, in relevant part, as follows:

With regard to the specialized experience element, the solicitation required Offerors to provide their experience and those firms that met all criteria would get additional credit. All the Offerors, with the exception of SAI/Comfort Systems have either Barracks and/or College Dorm/Apartment experience. SAI/Comfort has projects of size and scope but does not have type.

The SSA's decision reveals that the downgrading of plaintiff's Performance Capability rating affected plaintiff's standing in the ultimate contract award. In particular, the SSA explained her final cost/technical trade-off as follows:

As the lowest price and equally technical rated Offeror, Purcell Lawman JV provides the better value than the other firms that are rated the same with higher prices. . . . All firms, with the exception of SAI/Comfort Systems, have the same technical rating for both factors and low past performance risk. SAI/Comfort Systems has a Good and Excellent, for Performance Capability and Design Technical respectively. . . . The fact that SAI/Comfort Systems does not have the experience in new construction and moreover new construction of the same facility as the one required under this solicitation clearly is not a better value to the Government than firms that do have the experience. The experience in renovation and construction of a fuel station are not similar, which causes doubt that SAI/Comfort Systems will successfully perform and increases risk to the Government. Both Korte and Suffolk, higher rated firms with higher prices, have the exact experience—type, size and scope—which lessens risk to the Government.

7

Based on the foregoing, the SSA identified Purcell-Lawman as providing the best overall value to the government and awarded it the initial task orders for the project. The SSA additionally identified Korte and Suffolk as the next lowest-priced, technically equal offerors and accordingly selected them for award of individual IDIQ contracts. The SSA summarized her award decision as follows:

> Based upon the findings of the Source Selection Evaluation Board (SSEB) and price analysis conducted by the Contract Specialist, I have compared the proposals giving appropriate consideration to the evaluation criteria set forth in the solicitation and their relative importance. From this comparison of the proposals and a detailed assessment of the strengths associated with each, I have determined that the proposal submitted by Purcell Lawman JV provides the best overall value to the Government. Purcell Lawman offers an excellent solution at the lowest price. Accordingly, award for a contract and the Task Orders for the initial projects will be made to Purcell Lawman JV.
>
> Korte and Suffolk are the next lowest priced technically equal rated Offerors. Accordingly, the proposals from Korte Construction and Suffolk Construction are considered to represent the remaining best value to the Government and will be awarded a Multiple Award Task Order Contract with Task Order 0001 obligating the guaranteed minimum of $5,000.00.

The contracting officer notified plaintiff of the agency's decision in a letter dated April 30, 2009. By follow-up letter of May 6, 2009, the contracting officer additionally provided plaintiff with a written, post-award debriefing.

Plaintiff initially challenged the award before the Government Accountability Office ("GAO"), but the protest was denied on May 28, 2009. On June 9, 2009, plaintiff filed suit in this court. Plaintiff now asks the court to set aside the contract award and direct the Corps to reopen discussions or, in the alternative, to add plaintiff to the list of MATOC awardees.

## DISCUSSION

This court's bid protest jurisdiction is set forth at 28 U.S.C. § 1491(b)(1) (2006), a statutory provision which authorizes the court, in relevant part, "to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." The statute specifies that in addressing such an action, the court "may award any relief that [it] considers proper, including declaratory and injunctive relief," 28 U.S.C. § 1491(b)(2), and

further directs that "[i]n any action under this subsection, the court[] shall review the agency's decision pursuant to the standards set forth in section 706 of Title 5 [the Administrative Procedures Act]," 28 U.S.C. § 1491(b)(4). Under this standard of review, a procuring agency's decision must be upheld unless it is shown to be without any rational basis in fact or is erroneous as a matter of law. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Plaintiff challenges the instant procurement on essentially three grounds. As an initial matter, plaintiff contends that the SSA acted in violation of law when she downgraded plaintiff's Performance Capability rating from "excellent" to "good" without initiating discussions about plaintiff's prior construction experience. The SSA's decision was additionally flawed, plaintiff maintains, because the SSA discounted the experience plaintiff identified in its proposal and disregarded the evaluation scheme set forth in the solicitation. Finally, plaintiff contends that the SSA improperly conducted her best value analysis by, inter alia, ignoring the price differential among offerors and failing adequately to document her rationale. We address these issues in turn below.

I.

Plaintiff begins its argument by noting that the SSA's decision to downgrade plaintiff's Performance Capability rating from "excellent" to "good" was based entirely on her conclusion that plaintiff did not possess the "type" of specialized experience identified in the solicitation, specifically "apartment complexes, college dorms or their equivalent." Because this change in rating proved determinative in the contract award, plaintiff argues that the agency was required to raise its concerns about plaintiff's experience during discussions. Plaintiff asserts that the agency's failure to do so was a violation of law.

The Federal Acquisition Regulations ("FAR") set forth the guidelines for an agency's conducting of discussions. 48 C.F.R. § 15.306 reads, in relevant part, as follows:

> At a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

9

48 C.F.R. § 15.306(d)(3) (2009).

Plaintiff observes that while the agency in fact engaged it in discussions, the contracting officer made no mention of the issue that the SSA ultimately found dispositive: the increase in performance risk attributed to plaintiff's lack of experience in qualifying new construction. That omission, plaintiff maintains, violated the fundamental precept that an agency, once it has decided to conduct discussions, must ensure that those discussions are meaningful. ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 71 (2001) (holding that "[d]iscussions with offerors whose proposals are found to be in the competitive range [must] be 'meaningful' " and observing that "this requirement is not met if an offeror is not advised, in some way, of defects in its proposal that do not meet the requirements of the solicitation"). Meaningful discussions, plaintiff further contends, require that an offeror be given "a reasonable opportunity to address those areas of weakness which could have a competitive impact." SDS Int'l v. United States, 48 Fed. Cl. 759, 772–773 (2001) (internal quotation omitted). Plaintiff thus urges us to invalidate the SSA's award decision and to restore to plaintiff the opportunity for meaningful discussions.

We do not agree, however, that the SSA disregarded the requirement for meaningful discussions. As previously noted, 48 C.F.R. § 15.306(d)(3) requires that the contracting officer "[a]t a minimum . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information . . . ." 48 C.F.R. § 15.001 in turn defines the terms "deficiency" and "significant weakness" as follows:

> *Deficiency* is a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.
>
> . . . .
>
> *Weakness* means a flaw in the proposal that increases the risk of unsuccessful contract performance. A "significant weakness" in the proposal is a flaw that appreciably increases the risk of unsuccessful contract performance.

The FAR additionally advises that the primary objective of discussions is to "maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation." 48 C.F.R. § 15.306 (d)(2). Taken together, these FAR provisions indicate that a contracting officer must address those elements of a proposal that suggest an offeror's misunderstanding of a solicitation's requirements. Mandatory discussions, in other words, are designed to point out shortcomings in an offeror's proposal as judged from the standpoint of the

government's stated needs, rather than from the standpoint of the proposal's relative competitiveness.  As the Federal Circuit held in JWK Int'l Corp. v. United States, 279 F.3d 985, 988 (Fed. Cir. 2002), "aside from areas of significant weakness or deficiency, the contracting officer need not discuss areas in which a proposal may merely be improved."

Understood in this light, 48 C.F.R. § 15.306(d)(3) cannot be read to require the sort of discussions plaintiff now seeks.  In its proposal, plaintiff fully described its construction experience and the experience of its various subcontractors as required by the terms of the solicitation.  Plaintiff's proposal exhibited no "deficiency" or "significant weakness" within the definition of 48 C.F.R. § 15.001 and the Corps did not assign it one.  As this court observed in Academy Facilities Mgmt. v. United States, 87 Fed. Cl. 441, 457 (2009), "[a]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others" (internal quotations and citation omitted).  No discussion of plaintiff's lack of similar construction experience was therefore required.

Nor does it affect the outcome that 48 C.F.R. § 15.306 (d)(3) encourages a contracting officer to discuss aspects of an offeror's proposal "that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award."  Plaintiff's proposal suffered not from a lack of adequate explanation, but rather from a lack of specific, relevant experience.  Thus, any further discussions would not have changed the result.  And while plaintiff may be correct in saying that, had it been given the opportunity to address its construction background with the agency, it could have "taken other steps to provide enhanced Specialized Experience,"[2] such an assertion does not alter the fact that the information plaintiff set forth in its proposal was fully responsive to the requirements of the solicitation.  Under 48 C.F.R. § 15.306(d)(3), the scope and extent of discussions are "a matter of contracting officer judgment" and we see nothing in plaintiff's proposal that should have caused the agency to conclude that further discussions would materially enhance plaintiff's potential for award.  Plaintiff's failure to provide more detailed information is chargeable to it alone.  CACI Techs., Inc., B- 296946, 2005 CPD ¶ 198 at 5, 2005 WL 3143443 at *3 (Comp. Gen. Oct. 27, 2005) (observing that an offeror has the responsibility to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency).

---

[2] Defendant disputes this assertion, arguing that plaintiff could not simply have enhanced its experience through the addition of a subcontractor because of the solicitation's emphasis on the experience of prime contractors.  We need not resolve this issue, however,  because we conclude that the decision whether to address this aspect of plaintiff's proposal was fully within the agency's discretion.

11

II.

Plaintiff's second challenge to the procurement is that the SSA acted irrationally by disregarding the construction experience included in plaintiff's proposal and by failing to follow the weighting system identified in the solicitation. Upon closer examination, however, we conclude that neither argument has merit.

The relevant section of the solicitation, involving an offeror's Specialized Experience (a subfactor of Performance Capability intended to assess the similarity between an offeror's prior construction experience and the construction to be performed under the procurement), provided as follows:

> 5.4.1.1.1. Projects will be considered similar to this procurement if they are similar in complexity, in type, scope, or magnitude. The projects submitted should include the following criteria. Projects do not have to include all of the criteria; however, projects that meet all of the criteria may be more highly rated.
>
> 5.4.1.1.1.1. Construction of apartment complexes, college dorms or their equivalent or similar commercial institution. All work must be new construction.
>
> 5.4.1.1.1.2. Typical project size should range in square footage from 24,000 to 175,000 SF.
>
> 5.4.1.1.1.3. Construction value from $35,000,000.00 to $75,000,000.00.[3]
>
> 5.4.1.2. Additionally, projects should reflect the following features in terms of complexity.
>
> 5.4.1.2.1. Anti-terrorism and force protection along with security and access control.

As explained above, the SSA concluded that while the projects plaintiff submitted were similar to the instant procurement in scope (square footage), magnitude (dollar value), and complexity (force protection), plaintiff was lacking in project experience of the same type (i.e., the new construction of apartment complexes, college dorms, or their equivalent). The SSA accordingly gave plaintiff a lower rating than the other four offerors since, by the terms of the solicitation, offerors that met all criteria were eligible to receive a higher rating.

---

[3] Amendment 0001 to the solicitation changed the lower dollar threshold from $35,000,000 to $20,000,000.

Plaintiff finds two faults with the SSA's assessment. First, plaintiff maintains that the SSA interpreted the "type" criterion too narrowly, limiting it to the new construction of apartment complexes, college dorms, or their equivalent rather than, as the solicitation specifies, to the new construction of apartment complexes, college dorms or their equivalent <u>or similar commercial institution</u>. (Emphasis added.) Plaintiff argues that in doing so, the SSA failed to give plaintiff credit for experience identified as relevant by the SSEB. Second, plaintiff maintains that the SSA's downgrading of its Performance Capability rating from "excellent" to "good" placed undue weight on the type criterion, impermissibly violating the evaluation scheme set forth in the solicitation.

As an initial matter, we cannot accept plaintiff's contention that the SSA misconstrued the type of specialized experience sought in the solicitation or that she disregarded plaintiff's relevant experience by concluding that plaintiff "does not have . . . experience in new construction and moreover new construction of the same facility as the one required under this solicitation." The SSA recognized that plaintiff had "experience on new design build construction projects meeting the size in square footage, dollar magnitude, and force protection requirements as this requirement" and further observed that plaintiff's subcontractors had experience designing a townhouse-style campus apartment housing complex and a 150-bed college dormitory. Such a description, we believe, correctly characterizes the experience plaintiff submitted; nothing in the record suggests that plaintiff has new construction experience as a prime contractor in the building of apartment complexes, college dormitories, or housing of any type. Given that the solicitation explicitly provided that the agency would "place greater value on projects performed as a prime contractor than as a subcontractor," we can find no fault with the SSA's assessment.[4]

Nor do we believe that the SSA ignored experience identified as relevant by the SSEB. In her Source Selection Decision Document, the SSA included a chart summarizing the findings of the SSEB with regard to the Performance Capability factor. The chart indicated that plaintiff was the only offeror to have submitted experience in the categories of "Other Similar Construction," and "Other Similar

---

[4] Plaintiff submitted only four projects in which it served as the prime contractor: (1) an aviation facility (a helicopter hanger and vehicle maintenance facility); (2) an aircraft hydrant fuel system; (3) a company operations facility; and (4) a vehicle maintenance facility. Plaintiff did not, however, cite any experience as a prime contractor that could reasonably be characterized as involving "apartment complexes, college dorms or their equivalent or similar commercial institution." Purcell-Lawman, by contrast, served as the prime contractor in the construction of five barracks, including apartment-type units; Suffolk served as the prime contractor in the construction of five college dormitories, including apartment-type units; and Korte served as the prime contractor in the construction of both barracks and college dormitories.

Construction A/E [architect/engineer]."[5]  Plaintiff relies on this summary as evidence that the SSEB found that plaintiff possessed experience of a type similar to the procurement (thus equating the chart's "Other Similar Construction" category with the solicitation's "similar commercial institution" criterion).  Plaintiff contends, however, that the SSA disregarded this fact.

      The difficulty with plaintiff's argument is that the SSEB did not in fact find that plaintiff had experience of the type identified in the solicitation.[6]  The SSA's use of the phrase "similar construction" in her summary is not an acknowledgment that plaintiff's experience satisfied the type criterion, but rather a recognition that plaintiff's experience was similar in size and scope to the procurement.  That conclusion is made clear by the language immediately preceding the chart summary, in which the SSA noted that "all the Offerors, with the exception of SAI/Comfort Systems have either Barracks and/or College Dorm/Apartment experience.  SAI/Comfort Systems has projects of size and scope but does not have type."

---

[5] The chart summary appeared, in relevant part, as follows:

|  | SAI/Comfort Systems | Korte Construction Company | Suffolk Construction Company | Whiting Turner Contracting | Purcell-Lawman |
|---|---|---|---|---|---|
| UEPH Barracks Experience Prime | – | Yes | – | Yes | Yes |
| College Dorm/ Apartments Experience Prime | – | Yes | Yes | Yes | – |
| Other Similar Construction | Yes | – | – | – | – |
| UEPH Barracks Experience A/E | – | Yes | – | Yes | Yes |
| College Dorm/ Apartments Experience A/E | Yes | Yes | Yes | Yes | – |
| Other Similar Construction A/E | Yes | – | – | – | – |
| Performance Risk | Low | Low | Low | Low | Low |

[6] Plaintiff fails to identify any language in the SSEB's report that concludes that plaintiff possesses the type of experience sought in the solicitation.  Indeed, we read the SSEB's inadvertent double negative in reference to plaintiff's construction experience—concluding that "none of the ratings did not show experience relevant to barracks/dorms facilities"—to mean just the opposite.

14

The confusion, we believe, arises because the solicitation uses the word "similar" twice in describing the Specialized Experience subfactor—first in defining similar projects as ones that are "similar in complexity, in type, scope, or magnitude" and second in defining the type of project sought as the new construction of "apartment complexes, college dorms or their equivalent or similar commercial institution." A project could thus be considered similar under the first definition (by, for example, meeting the scope, magnitude, and complexity requirements) without being deemed of a similar type under the second definition. It is that situation, we believe, that occurred in the present case.

Nor do we believe that the SSA misapplied the solicitation's weighting system in downgrading plaintiff's Performance Capability rating from "excellent" to "good." In the solicitation, the Performance Capability factor consisted of four subfactors that were not separately rated—Organization and Technical Approach, Proposed Task Order Duration and Summary Schedule, Specialized Experience, and Utilization of Small Businesses—with the fifth subfactor, Past Performance, rated separately for risk. In addition, under the Specialized Experience subfactor, an offeror's past projects were judged under the four criteria discussed above (type, scope, magnitude, and complexity).

The parties agree, based on both the solicitation and the case law, that the subfactors were to be weighted equally.[7] In plaintiff's view, however, the proper application of that evaluation scheme should not have resulted in the downgrading of its Performance Capability rating because the area in which it was judged to be lacking—project type—constituted only one of four equally weighted components of Specialized Experience, which in turn was one of five elements that made up the Performance Capability factor, identified as only the second most important of the evaluation factors (behind Design Technical). Plaintiff argues, in other words, that the type criterion did not carry enough overall "weight" to permit the SSA to downgrade plaintiff's entire Performance Capability rating or to serve as the exclusive basis for the contract award. Plaintiff thus views the downgrading of its Performance Capability rating as a distortion of the solicitation's evaluation scheme resulting from the SSA's allegedly misplaced emphasis on construction type.

---

[7] Although the solicitation did not explicitly provide that the Performance Capability subfactors were to be weighted equally, in the Design Technical section of the solicitation the phrase "not rated separately" was identified to mean "equal in importance," suggesting that the same approach was intended for the evaluation of Performance Capability. More significantly, however, the case law is clear that, where a solicitation fails to identify the relative importance of evaluation subfactors, the subfactors must all be accorded equal weight. Isratex, Inc. v. United States, 25 Cl. Ct. 223, 228 (1992).

15

Plaintiff's argument, however, ignores the fact that the solicitation explicitly instructed offerors that "projects that meet all of the criteria may be more highly rated." As defendant explains, "it was the absence of relevant experience for one of the four criteria, for project 'type,' rather than assignment of any particular 'weight' to that criteria, that limited award of a higher rating to plaintiff's proposal for failing to satisfy 'all of the criteria' for similar projects." The SSA, in other words, found that plaintiff's specialized experience satisfied three of the four criteria—scope, dollar magnitude, and force protection—but did not warrant a higher rating because it failed to satisfy type.

While we do not believe that the SSA, in evaluating the four criteria of Specialized Experience, was required to do so with strict mathematical precision, a numerical example may be instructive. Specialized Experience, as one of four, not-separately rated subfactors of Performance Capability, may have accounted for as much as 25 percent of an offeror's Performance Capability rating. Assuming that the other offerors in the competitive range received a premium for meeting all four of the Specialized Experience criteria (type, scope, magnitude, and complexity), the discrepancy between an offeror who received a perfect score for its Specialized Experience and an offeror who met only three of the four criteria could be large enough mathematically to account for the difference between a Performance Capability rating of "excellent" and a Performance Capability rating of "good." Indeed, given the solicitation's explicit preference for specialized experience that met all four criteria, it is difficult to imagine how the SSA could have given recognition to an offeror's distinguishing accomplishment if not through a difference in adjectival rating. The alternative would have been to give plaintiff the highest rating despite its lack of the type of experience the agency explicitly sought. The SSA, we conclude, was reasonable in rejecting this result.

Ultimately, the Corps needed some way to distinguish between proposals to select three offerors for award. Consistent with the solicitation's requirement that non-price evaluation factors were "significantly more important than price," the agency reasonably determined that plaintiff's specialized experience, and its resulting rating of "good" for Performance Capability, set plaintiff apart from offerors who possessed the exact construction experience as sought in the solicitation. As this court has recognized, "[f]requently in close cases . . . a minor weakness or a single strength can become the determinative factor in an award decision." Computer Sciences Corp. v. United States, 51 Fed. Cl. 297, 309 (2002).

Plaintiff argues in its reply brief, however, that even if such weighting were appropriate, the SSA nevertheless applied the weighting scheme unequally by giving another offeror a Performance Capability rating of "excellent" when it too satisfied only three of the four criteria. In particular, plaintiff contends that despite the SSEB's and SSA's findings to the contrary, Suffolk Construction did not possess experience in force protection (i.e., experience of the same complexity as that sought

in the solicitation) and thus, like plaintiff, should have received a "good" rather than an "excellent" Performance Capability rating.

Defendant counters that Suffolk did indeed submit projects that addressed anti-terrorism/force protection ("ATFP") requirements in considerable detail, but urges the court to reject plaintiff's argument on the ground that is untimely and that it delves into "technical minutiae" that should not be the province of the courts. See, e.g., Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (observing that it is well-established that parties may not raise new arguments for the first time in a reply brief); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (refusing to "second guess" the "minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement, which involve discretionary determinations of procurement officials"). Although we would be reluctant to reject plaintiff's argument on the first ground—particularly since we construe it merely as a further illustration of the conduct of which plaintiff originally complained—the second ground gives us serious pause. At a minimum, Suffolk's proposal makes reference to ATFP requirements by, for instance, observing that "[a]ccess control security elements were installed at all entrance/exit areas as part of the construction of this project" and "[a]ll exterior doors in the building swing outwards in accordance with ATFP requirements."[8] Whether or not such experience adequately addresses the complexity criterion, however, is a matter over which this court has no expertise. Under such circumstances, we have no choice but to defer to the judgment of both the SSEB and the SSA who concluded that Suffolk satisfied all four of the Specialized Experience criteria. In the absence of a showing that this determination is inherently unreasonable, the agency's judgment must be allowed to stand. Leboef, Lamb, Greene & MaCrae, L.L.P. v. Abraham, 347 F.3d 315, 320 (D.C. Cir. 2003) ("because agency procurement decisions implicate the agency's 'technical expertise,' the court's review is highly deferential").

---

[8] Several of Suffolk's projects contained similar force protection features, including the following description of a college dormitory:

> All exterior doors in the building swing outwards in accordance with the ATFP requirements. Exterior windows are aluminum framed with laminated glazing and were designed to achieve structural compliance with the ATFP requirements including anchorage into the exterior wall structure of the building. Steel exterior doors and frames are anchored into the exterior wall structure of the building in compliance with ATFP requirements. Building security systems include card access to all exterior doors and suites and monitored video cameras throughout campus.

III.

In its final argument, plaintiff contends that the procurement's myriad improprieties—including the agency's failure to conduct meaningful discussions and the SSA's disregard of both plaintiff's relevant experience and of the proper weighting of evaluation factors identified in the solicitation—resulted in an incorrect evaluation of plaintiff's proposal and thus a best value analysis that was clearly flawed. Plaintiff maintains that had such an analysis taken into account plaintiff's correct Performance Capability rating, plaintiff would have been revealed as a better value to the government than either Korte or Suffolk and would therefore have had a significantly better chance of obtaining an award. In addition, plaintiff asserts that, despite the finding of both the SSEB and the SSA that plaintiff's Past Performance risk rating was low, the SSA nevertheless concluded that plaintiff's lack of specialized experience created a risk to successful performance, impermissibly considering risk twice with inconsistent results. Finally, plaintiff asserts that the best value analysis improperly undervalued the difference in the offerors' proposed costs and thus, like the SSA's downgrading of plaintiff's Performance Capability rating, was irrational and insufficiently documented.

Because we find no fault with the manner in which the agency conducted discussions nor with the Performance Capability rating it assigned to plaintiff, we must reject plaintiff's first argument on its face. Similarly, we find plaintiff's second argument unavailing because the SSA's observation regarding risk merely reflected the definitions inherent in the respective adjectival ratings and not a separate or inconsistent assessment of risk.[9] Plaintiff's third argument, however, requires closer examination.

In support of its contention that the SSA undervalued the difference in the offerors' proposed costs, plaintiff observes that its final evaluated price was

---

[9] In a section defining the adjectival ratings to be assigned to the various evaluation factors, the solicitation indicated that for a "good" rating, "[t]he risk of unsuccessful performance is low." For an "excellent" rating, by contrast, the solicitation provided that "[t]he risk of unsuccessful performance is very low." (Emphasis added.) The SSA's observation that plaintiff's lack of experience "increases risk to the Government" and that the other offerors' more relevant experience "lessens risk to the Government" is thus a mere restatement of these definitions. By the solicitation's terms, in other words, plaintiff's Performance Capability rating of "good" represented a higher risk of unsuccessful performance than did the other offerors' "excellent" ratings.

significantly lower than two of the three offerors selected for award.[10] Despite that discrepancy, however, plaintiff contends that the SSA offered no rationale for choosing two higher-priced offerors but simply made the conclusory statement that "Korte and Suffolk are the next lowest priced technically equal rated Offerors," and are "[a]ccordingly . . . considered to represent the remaining best value to the Government." In plaintiff's view, the SSA failed to explain how the other awardees' alleged superiority in a single component of five subfactors of the second most important evaluation factor outweighed the $5 to $7 million cost savings offered by plaintiff.

Plaintiff is correct that an agency, by law, may not disregard price in a negotiated procurement. Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008). The Competition in Contracting Act in fact requires an agency, "[i]n prescribing the evaluation factors to be included in each solicitation for competitive proposals," to "include cost or price to the Federal Government as an evaluation factor that must be considered in the evaluation of proposals." 10 U.S.C. § 2305(a)(3)(A)(ii); see also 41 U.S.C. § 253a(c)(l)(B). Plaintiff is additionally correct that the solicitation itself stated that "[i]f there is a lower priced, conforming offer(s), the Contracting Officer/Source Selection Official must determine that the added value of a more expensive proposal for the initial task order would justify award to that Offeror." These requirements, we believe, have been fulfilled.

The SSA explained her cost/technical trade-off as follows:

All firms, with the exception of SAI/Comfort Systems, have the same technical rating for both factors and low past performance risk. SAI/Comfort Systems has a Good and Excellent, for Performance Capability and Design Technical respectively. Section 00 22 11 sets forth the relative importance of evaluation factors as Factor 2, Design Technical most important, Factor 1, Performance Capability second important and Factor 3, Price third important. Also all technical factors when combined are significantly more important than price. The fact that SAI/Comfort Systems does not have the experience in new construction and moreover new construction of the same facility as the one required under this solicitation clearly is a not a better value to the Government than firms that do have the experience. The experience in renovation and construction of a fuel station are not similar, which causes doubt that SAI/Comfort Systems will success-fully perform and increases risk to the Government. Both Korte and

---

[10] As noted above, plaintiff's proposed price was **[REDACTED]**; Purcell-Lawman's was **[REDACTED]**; Korte's was **[REDACTED]**; and Suffolk's was **[REDACTED]**.

Suffolk, higher rated firms with higher prices, have the exact experience—type, size and scope—which lessens risk to the Government.

In her analysis of the Price factor, the SSA determined that Korte's and Suffolk's offers were below both the Contract Cost Limitation ("CCL") and the Independent Government Estimate ("IGE") and thus fully satisfied the solicitation's pricing target.  In addition, the SSA found that Korte and Suffolk, unlike plaintiff, had "the exact experience" in building barracks-type housing that the agency sought, and consequently had a better chance to "successfully perform."  Given the solicitation's pronouncement that non-price evaluation factors were "significantly more important than price," the SSA had full discretion to reject plaintiff's lower-priced proposal in favor of Korte's and Suffolk's technically higher-rated proposals (but whose prices were still below the CCL and IGE).  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368–69 (Fed. Cir. 2009) (describing the rational-basis review of procurement decisions as "highly deferential"); E.W. Bliss Co., 77 F.3d at 449 (observing that in a best value procurement, procurement officials "have substantial discretion to determine which proposal represents the best value for the government").  The fact that the SSA made that trade-off is explicitly set forth in her decision.  We see no error of judgment or abuse of discretion in the SSA's actions.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for injunctive relief is denied and defendant's cross-motion for judgment on the administrative record is granted.  Accordingly, the clerk is directed to enter judgment dismissing plaintiff's complaint.

s/John P. Wiese  
John P. Wiese  
Judge
